IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| KATHLEEN G. KILCULLEN, | ) | |
| | ) | |
| Respondent, | ) | No. 30792-1-III |
| | ) | |
| v. | ) | |
| | ) | |
| CALBOM & SCHWAB, P.S.C., | ) | PUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |

SIDDOWAY, A.C.J. — The law firm of Calbom & Schwab PSC (C&S) appeals the trial court's summary judgment determination that a shareholder loan received from a former partner, Kathleen Kilcullen, was due, owing, and must be promptly paid. We agree with the law firm that the court relied on its concern over a long, unexplained delay in payment by the law firm and the *possibility* of a legal basis for immediate liability rather than on a demonstration by Ms. Kilcullen that undisputed facts support relief. On the record presented, summary judgment was unwarranted. We reverse and remand.

FACTS AND PROCEDURAL BACKGROUND

From 1992 until early January 2010, Ms. Kilcullen, a lawyer, was a shareholder of C&S, a professional services corporation that provides legal services. C&S terminated her employment in January 2010, allegedly for cause. While the basis for her discharge

from employment is the subject matter of an ongoing dispute, it is not a subject matter of this appeal. This appeal concerns, instead, an amount owed to Ms. Kilcullen on loans she made to the law firm in years before she was discharged.

C&S is a C corporation for federal tax purposes and, like many such professional corporations, it determines the amount of net income available after payment of its expenses at year-end and then declares and distributes bonuses to its lawyer-shareholders in that amount. The purpose is to reward the lawyer-shareholders for their service currently and to avoid having net income taxed at the corporate level. Given the ongoing cash flow needs of the firm's operations, however, it is impossible for the firm to pay out all of its available net income as bonuses without borrowing money for operations at the same time. The law firm's practice for at least 2002 through 2009 was, then, to declare shareholder bonuses at year-end but at the same time borrow a corresponding amount from the same shareholders, to be repaid, with interest, when the corporation had built up sufficient operating capital.

The bonuses and anticipated terms of the associated borrowing were reflected in minutes of the annual meetings of the law firm's board of directors for 2002 through 2009. The minutes of the 2002 meeting are typical of those for later years through 2008, with the sole exception being the dollar amount of the operating capital requirement, which varied in years 2003 and 2008. The 2002 minutes provide:

2

>The president reviewed the business of the corporation from 1-1-02 to 12-27-02 . . . On motion duly made, seconded and passed it was agreed to bonus out all net taxable income to the shareholders.

Clerk's Papers (CP) at 43. After identifying the amount to be paid as a bonus to each shareholder, the minutes continued:

>On motion duly made, seconded and passed *it was agreed that the stockholders would loan the corporation $315,222 at 2% above prime or 6.25% interest, for the year of 2002. . . . Repayment of loans will be made after the corporation has $100,000 in operating capital in the bank.*

*Id.* (emphasis added). The minutes for the directors' annual meeting for 2003 increased the operating capital required before the loans would be repaid to $150,000. The operating capital requirement reverted to $100,000 in 2004 and later years until being increased to $200,000 in 2008.

In 2009, the minutes for the annual directors' meeting held on December 30 provided for relatively small shareholder bonuses and stated that "[t]here was enough cash available to pay the shareholder bonus. No new loans were required from the shareholders." CP at 51. The minutes then provided unprecedented future discretion for determining when to pay outstanding shareholder loans, stating:

>Repayment of previous loans will not be made until *a minimum of $200,000* is available for operating capital.
>It was agreed that *payment of prior notes to be made using good business practices and establishing adequate reserves for business such as balloon payments on loans, claims against the corporation and payment of employee bonuses.*

*Id.* (emphasis added).

3

The summary judgment record is silent as to whether Ms. Kilcullen was a director of the firm in addition to being a shareholder. The record does not tell us whether she was present (whatever her status) at the annual meetings of directors at which these terms were reportedly agreed. When summary judgment was argued in the trial court, it was suggested by Ms. Kilcullen's lawyer that perhaps a meeting of the directors, as such, did not even take place; the declarations submitted to the court are silent on that point.[1] Although the record included a sample promissory note to one of the shareholders (though in a principal amount that did not correspond to any loan amount reflected in the 2002 through 2009 directors' minutes), the sample was unsigned. The unsigned sample did not provide for a time for repayment but implied that an understanding existed independent of the note, since it included a provision for acceleration in the event of default in payment "when the same shall become due and payable." CP at 46. When summary judgment was argued, Ms. Kilcullen's lawyer represented to the court that he was aware of no actual promissory note executed by the corporation in favor of Ms.

---

[1] Ms. Kilcullen's lawyer, evidently referring to the minutes of the 2009 annual meeting of the directors, argued:

> At the end of 2009, the evidence is that Mr. Schwab and Mr. Lybbert apparently signed some meeting minutes wherein they dictated how they were going to divvy up the profits of the corporation at that—end of that year, and I don't see any indication that my client participated in the decision not to repay the loans at that time.

Report of Proceedings at 12.

4

Kilcullen; the lawyer for C&S responded that he believed notes existed. No signed notes are included in the record on appeal.

After she was discharged, Ms. Kilcullen commenced this action. A little over a year later, she moved for partial summary judgment on her claim for repayment of the loans. She advanced three arguments: first, that the informal loan agreement between her and the company did not provide a time for repayment and the trial court should determine what that reasonable time would be; second, that her discharge by the firm constituted a material breach of the loan contract; and third, that because C&S's repayment obligation had proved illusory, there was no enforceable contract and the law firm had been unjustly enriched by retaining the amount of her bonuses.

She supported her motion with her declaration, in which she acknowledged that she was aware of a "standard operating procedure" under which the firm's shareholders used their bonuses to make interest-bearing loans to the firm for operating expenses and the firm's "practice" to repay those loans as operating capital benchmarks were met. CP at 24-25. She conceded that she had received $20,000 from C&S in September 2010, shortly before commencing suit, with the payment described as "'shareholder distribution.'" CP at 25.

She also alleged in her declaration that

[i]t was my understanding, which I believe was a reasonable understanding, that every shareholder loaned such funds on a good faith basis that we would continue our employment with Calbom & Schwab. . . . While

working at Calbom & Schwab, each of the attorney shareholders had an incentive to support the operation and reduce the costs of Calbom & Schwab. After the termination of my employment by Calbom & Schwab, such incentive no longer exists.

*Id.*

C&S opposed Ms. Kilcullen's motion on several legal grounds. Factually, it provided no more particulars than had Ms. Kilcullen about when and with whom she agreed to shareholder loan terms. Instead, it submitted the declaration of G. Joe Schwab stating that the shareholders had made loans to the corporation, received notes, and that "[t]he shareholders, including Ms. Kilcullen, have agreed that these promissory notes would be paid based upon a formula which has remained essentially the same but for an escalation of the dollar reserves required before any payment was made on the promissory notes." CP at 30-31. He implied but did not clearly assert that Ms. Kilcullen was present at annual directors' meetings at which loan terms were addressed, making reference to "[t]he minutes of December 30, 2009, . . . to which Ms. Kilcullen was a participating *shareholder*, reflected that the *shareholders* agreed, once again" that repayment of existing loans would be deferred. CP at 33 (emphasis added).

The trial court heard argument on the motion in March 2012 and announced thereafter that it would grant the motion, explaining, in part, that

this is a small, closely held corporation where the principals of the corporation have the ability to skew the numbers however they want to; whether it be for some reason adverse to Ms. Kilcullen, or whether it be for some legitimate income tax reason, they have that ability to do that. And I

6

think that's the point, one of the points that Mr. Lacy's making on behalf of his clients (sic) is that maybe it'll never be paid.

Report of Proceedings at 16-17. The court reduced the principal and interest Ms. Kilcullen claimed to be owed by the $20,000 paid in September 2010, the character of which was in question, and ordered the remaining $69,650.83 principal and $20,000.00 interest owed to be paid by C&S within four months. C&S moved for reconsideration, which was denied.

The trial court directed entry of a final judgment on Ms. Kilcullen's shareholder loan-based claim, finding there was no just reason for delay. C&S appeals.

## ANALYSIS

C&S makes several assignments of error to the trial court's order granting summary judgment that fall into two general categories. It argues first that genuine issues of material fact remain regarding the terms of the parties' loan agreement and summary judgment was therefore inappropriate. It next argues that reasons offered by the trial court for concluding that the agreement C&S contended existed was unenforceable were unsupported by facts and legally erroneous.

We are unable to determine whether genuine issues of material fact will ultimately require trial. But Ms. Kilcullen's limited materials filed in support of her 2012 summary judgment motion fall short of satisfying her prima facie burden of demonstrating the absence of a genuine issue of fact. The record presented also fell short of demonstrating

7

as a matter of law that the operating capital benchmark for repayment asserted by C&S resulted in an illusory repayment obligation. We address the issues in turn.

I

C&S first argues that Ms. Kilcullen's claim that the parties had an enforceable contract that was breached raises issues of fact that are disputed and require trial. Summary judgment is appropriate only if the pleadings, affidavits, answers to interrogatories, admissions, and depositions establish that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. CR 56(c). On an appeal from summary judgment, the standard of review is de novo. *Hisle v. Todd Pac. Shipyards Corp.*, 151 Wn.2d 853, 860, 93 P.3d 108 (2004). Like the trial court, we review all facts and reasonable inferences from the facts in a light most favorable to the nonmoving party. *Jones v. Allstate Ins. Co.*, 146 Wn.2d 291, 300, 45 P.3d 1068 (2002). The moving party bears the initial burden of proving that there is no genuine issue of material fact. *Young v. Key Pharm., Inc.*, 112 Wn.2d 216, 225, 770 P.2d 182 (1989).

Disputes over the existence of oral contracts are generally not appropriate for summary judgment. Ordinarily that is because they depend on an understanding of surrounding circumstances, the intent of the parties, and the credibility of witnesses. *Plese-Graham, LLC v. Loshbaugh*, 164 Wn. App. 530, 541, 269 P.3d 1038 (2011) (citing *Duckworth v. Langland*, 95 Wn. App. 1, 6-7, 988 P.2d 967 (1998)); *Crown Plaza Corp.*

8

*v. Synapse Software Sys., Inc.*, 87 Wn. App. 495, 500-01, 962 P.2d 824 (1997). The record submitted in connection with Ms. Kilcullen's motion defies summary judgment for an additional reason: it raises more questions about what the parties agreed to than it answers.

The basis for Ms. Kilcullen's understanding of "standard operating procedure" as alleged in her complaint is important but we have no information on what was communicated to her, by whom, about the loan terms—or what she communicated back. Washington follows the objective manifestation theory of contracts, which arrives at the intent of the parties based on the objective manifestations of their agreement rather than any unexpressed subjective intent or understanding. *Condon v. Condon*, 177 Wn.2d 150, 162, 298 P.3d 86 (2013). Yet the declarations of Ms. Kilcullen and Mr. Schwab are wholly conclusory as to what the parties agreed or understood, without recounting any objective manifestation of that agreement. Is it contended that Ms. Kilcullen was at the annual directors' meetings each year at which the repayment benchmarks were raised and voted upon? That could be important. If not, who *did* participate in the directors' meetings and how and when did they get the shareholders' agreement to the shareholder loan terms that were discussed and approved at those meetings? Did the corporation execute promissory notes? Did they deliver any notes to Ms. Kilcullen? If the notes provided no time for payment on their face, was there some other objectively manifested agreement between Ms. Kilcullen and an authorized representative of the law firm as to a

9

time or condition for payment that would make them something other than demand notes? *See* RCW 62A.3-108(a) (promise is "payable on demand" if it does not state any time of payment).

In short, we cannot determine from the summary judgment record whether the "standard operating procedure" as understood by Ms. Kilcullen was something to which she agreed or whether it was a practice unilaterally adopted by managing partners of the firm to which she acquiesced as practice but that was not the subject of mutual assent on essential terms sufficient to create a binding contract.

In addition, and as the law firm agrees, the parties dispute whether one term of her agreement to loan was her continued employment. Br. of Appellant at 10. At oral argument on appeal, Ms. Kilcullen's lawyer stated that Ms. Kilcullen conceded the existence of a contract for purposes of her summary judgment motion, but does not concede a meeting of the minds on the terms claimed by the law firm. Generally, whether mutual assent exists as to the terms of a contract is a question of fact. *Plese-Graham*, 164 Wn. App. at 541. The record presented to the trial court did not provide a basis for determining as a matter of law whether the parties had an agreement, let alone what it might be.

II

Ms. Kilcullen nonetheless argues that the judgment can be affirmed on the basis that the conditional repayment obligation contended for by C&S (which she can concede

10

for purposes of summary judgment) might never be paid, can be manipulated, is illusory, and prevents mutuality of obligation.

A trial court has the authority to excuse a condition to performance (such as the operating capital requirement) where enforcing the condition would cause disproportionate forfeiture. RESTATEMENT (SECOND) OF CONTRACTS § 229 (1981); *Ashburn v. Safeco Ins. Co. of Am.*, 42 Wn. App. 692, 698, 713 P.2d 742 (1986) (citing RESTATEMENT § 229); *Hegeberg v. New England Fish Co.*, 7 Wn.2d 509, 522, 110 P.2d 182 (1941) (citing predecessor provision of *Restatement of Contracts* § 302 (1932)). It has the authority to excuse a condition such as the operating capital benchmark if its occurrence has been prevented or hindered through a breach of the covenant of good faith and fair dealing. RESTATEMENT (SECOND) §§ 205, 239; *Cavell v. Hughes*, 29 Wn. App. 536, 539, 629 P.2d 927 (1981); *Refrigeration Eng'g Co. v. McKay*, 4 Wn. App. 963, 969-70, 486 P.2d 304 (1971). It has the authority to excuse the condition of the operating capital benchmark for impossibility and substitute a reasonable time if, e.g., it determines that the benchmark was provided for as a convenient time but not as an absolute contingency and that changes in the firm's operations will prevent the benchmark from being reached. *See* RESTATEMENT (SECOND) § 271; 14 RICHARD A. LORD, WILLISTON ON CONTRACTS § 42:7, at 402 (4th ed. 2000).[2] If the evidence establishes that the 2009

---

[2] *Williston* cites the following as stating well the general principle:

directors' meeting minutes reflect the parties' agreement, then the court is authorized to determine whether the repayment condition—that a "minimum" of $200,000 be available for operating capital and that the law firm follow "good business practices and [establish] adequate reserves"—creates an illusory obligation, entitling Ms. Kilcullen to restitution. A supposed promise may be illusory because it is so indefinite that it cannot be enforced. *Spooner v. Reserve Life Ins. Co.*, 47 Wn.2d 454, 458, 287 P.2d 735 (1955). On the other hand, a promise to make payment that is conditioned on profitability is not illusory if the promisor's determination of profits is subject to definite, enforceable standards. *King County v. Taxpayers of King County*, 133 Wn.2d 584, 599-600, 949 P.2d 1260 (1997) (Seattle Mariners' lease obligation to share operating profits with King County was not illusory where the organization was required to account for its operating results "'in accordance with generally accepted accounting principles'" that the county had the right to audit). These issues must be determined at trial, however, unless the court is presented with a summary judgment record that demonstrates no genuine issue of material fact.

---

"If parties intend that a debt shall be contingent, as in *respondentia* or bottomry contracts, then it will be so held by the Court. If, on the contrary, they intend that the debt shall be absolute, and fix upon the future event as a convenient time for payment merely, as where a drover purchases cattle, promising to pay for them on his return from market, overlooking the contingency that he may never return, then the debt will not be contingent; and, if the future event does not happen as contemplated, the law will require payment to be made within a reasonable time."

14 LORD, *supra*, § 42:7, at 402-03 (quoting *DeWolfe v. French*, 51 Me. 420 (1864)); see accord *Pegg v. Olson*, 31 Wyo. 96, 223 P. 223, 225 (1924) and cases cited therein.

It is clear from the trial court's oral decision that it was concerned that more than two years had passed since Ms. Kilcullen was discharged, yet with the exception of a single payment made to her in September 2010, C&S had not met its operating capital benchmark in that entire period of firm operations. At oral argument of the appeal we were informed that even now—September 2013, over three and one-half years since Ms. Kilcullen was discharged—the firm has made no further payment, evidently falling short of the operating capital benchmark for that further period of time. That long period of nonpayment raised a question when summary judgment was argued in 2012, and raises one now, over what benchmark (if any) was agreed and whether it remains realistic or is being manipulated.[3] But it is so far only a question. However this case is ultimately resolved—through trial, or through further summary judgment proceedings—any legal conclusion that the operating benchmark should be excused or a reasonable time for payment substituted must be based on evidence, not conjecture. Evidence is needed, e.g., on what contract terms were offered and accepted, if any; and whether a firm that formerly was able to reach operating benchmarks enabling it to make loan payments to its shareholders will foreseeably be able to reach those benchmarks again.

---

[3] One possibility and concern is that the law firm has ceased a practice of rolling over its borrowing annually and is effectively relying on loans made by shareholders before 2009 as a permanent operating fund.

13

No. 30792-1-III
*Kilcullen v. Calbom & Schwab PSC*

We reverse the order granting summary judgment and remand for further proceedings consistent with this opinion.

Siddoway, A.C.J.

WE CONCUR:

Brown, J.

Fearing, J.

14