IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| DAVID MARTIN, a single person, | ) | No. 34103-8-III |
| | ) | |
| Appellant, | ) | |
| | ) | |
| v. | ) | PUBLISHED OPINION |
| | ) | |
| GONZAGA UNIVERSITY, | ) | |
| | ) | |
| Respondent, | ) | |
| | ) | |
| CHRIS STANDIFORD AND "JANE | ) | |
| DOE" STANDIFORD, a marital | ) | |
| community, | ) | |
| | ) | |
| Defendants. | ) | |

FEARING, C.J. — David Martin sues his former employer, Gonzaga University, for

discharge in employment in violation of public policy and for a violation of a statute

allowing an employee access to his personnel file. We affirm a summary judgment

dismissal of the wrongful discharge claim. Martin fails to present evidence to support the

fourth element of the claim, that element being the absence of an overriding justification

for Gonzaga University to fire Martin. The undisputed facts, including Martin's own

words, establish insubordination. We reverse the summary judgment dismissal of Martin's claim that the university denied him access to his personnel file on the ground that Gonzaga University failed to provide testimony that it produced all of the file to Martin.

Few decisions delineate the nature of the overriding justification element of the wrongful discharge in violation of public policy cause of action. We devote pages to define and demarcate the element.

## FACTS

This lawsuit arises from the employment of David Martin at Gonzaga University's Rudolf Fitness Center (RFC). Because the trial court granted Gonzaga University's summary judgment motion, we recite the facts in a light most favorable to David Martin, although we also include some of the university's evidence.

Spokane's Jesuit school, Gonzaga University, opened the Rudolf Fitness Center in 2003 for use by students, faculty, and staff. A basketball fieldhouse and a pool, among other facilities, occupy the fitness center. During the summer months, the university rents the fitness center to other organizations such as youth camps and leagues. The university's Athletics Department oversees the fitness center.

At unknown dates before Gonzaga University's hire of David Martin in 2008,

2

university students sustained injuries when playing basketball and striking bare concrete

walls behind the basketball hoops in the Rudolf Fitness Center. Injuries included

concussions, head trauma, broken bones, dislocated shoulders, and lacerations. No

protective padding covered the walls. Basketball courts at other Gonzaga University

facilities included padding on the walls.

Beginning in 2004, Gonzaga University Athletics Department staff discussed

affixing prophylactic padding to the basketball court walls at the Rudolf Fitness Center.

No code requirement or National Collegiate Athletic Association regulation requires the

use of pads. Nevertheless, in 2004, Senior Associate Athletics Director Chris Standiford

instructed Assistant Athletics Director Jose Hernandez to hire a risk management

consultant to assess the need for pads along the walls of the basketball courts. The

Athletics Department later declined to follow the consultant's recommendation to install

pads. The university then estimated the cost of the padding as $30,000.

During a deposition in this lawsuit, Assistant Athletics Director Jose Hernandez

testified that he "believed" that Senior Associate Athletics Director Chris Standiford

rendered the 2004 decision rejecting installation of protective pads. Clerk's Papers (CP)

at 66. In 2007, Hernandez again engaged a consultant to assess the need for safeguarding

pads and the costs of the pads. After the second assessment, Hernandez recommended to

his supervisor, Assistant Athletics Director Joel Morgan, that Gonzaga University install the pads. The Athletics Department again declined to install the recommended pads. Hernandez does not know whether Morgan or Standiford made the decision. Morgan recalled no such recommendation.

Gonzaga University hired plaintiff David Martin on January 2, 2008, to work as an assistant director of the Rudolf Fitness Center. In addition to his wages, Martin received other benefits, including health insurance and free tuition. Martin utilized his tuition benefit and enrolled in Gonzaga's master's degree program for sports administration.

When David Martin gained employment at the Rudolf Fitness Center, the fitness center's employees included Assistant Athletics Director Jose Hernandez, Associate Director Shelly Radtke, and Assistant Directors Andrew Main and Kerri Conger. Hernandez also enjoyed the title of University assistant athletics director. The university's Athletics Department's chain of command encompassed the Rudolf Fitness Center's employees. We have already mentioned some of the supervisor's names and titles. The fitness center's associate and assistant directors initially reported to the center's Assistant Athletics Director Hernandez. Later, Associate Director Shelly Radtke directly supervised David Martin. Hernandez reported to Gonzaga University Assistant Athletics Director Joel Morgan. Morgan reported to university Senior Associate Athletics

4

Director Chris Standiford. Standiford reported to Mike Roth, director of Athletics.

After David Martin's hire, Gonzaga University students continued to sustain injuries while playing basketball in the Rudolf Fitness Center and striking concrete walls while running full speed. For several years, David Martin requested that Gonzaga University install protective padding on the fieldhouse walls behind the basketball hoops, although we lack evidence as to the number of times and the dates of the requests. Martin recalled one request during his second year of employment after a student sustained serious injuries while playing basketball. Martin forwarded a concern to his supervisor, Jose Hernandez, and the pair discussed the need to install padding to help minimize the risk of injuries. Martin deemed that Gonzaga University held a legal obligation to maintain a safe environment for students and employees. He worried about blood and other bodily fluids spilled during accidents could create pathogen hazards. In response to Martin's expression of concern, Fitness Center Assistant Athletics Director Hernandez informed Martin that requests for protective padding could only be made once a year at the budget meeting.

In a deposition, Jose Hernandez confirmed that David Martin spoke to him about installing pads. According to Hernandez, Martin repeatedly and passionately spoke about the need for wall padding.

According to David Martin, before he raised this safety concern to Jose Hernandez, he received a raise for good work performance. Thereafter, Martin received no pay raises despite receiving complimentary performance evaluations. David Martin does not present records to support these assertions.

During the employment of David Martin, other Rudolf Fitness Center employees expressed concerns about the lack of protective wall padding in the basketball courts. According to Associate Director Shelly Radtke and Assistant Director Andrew Main, all Athletics Department staff discussed the lack of padding on the walls of the Rudolf Fitness Center. Neither Radtke nor Main identified a supervisor to whom either raised a safety concern about the walls.

One or more supervisors of David Martin periodically reviewed his job performance. Martin testifies that supervisors never advised him of any work performance deficiencies. Records show, however, that Martin received below average ratings for his interpersonal skills, problem solving, professional development, and leadership responsibilities on his April 28, 2011 performance review. The review noted that Martin's overall performance "was below the quality and standard that he is capable of." CP at 128. The review further read:

> [Martin's] inconsistent performance kept him from meeting the basic
> job requirements. Throughout the academic year, at times he would

6

displayed [sic] great work ethics and at other times he would not. This up
and down behavior and conduct was a surprise and uncharacteristic of him.

CP at 128. In addition, the review commented that Martin did an excellent job

developing and implementing a training program for lifeguards. No supervisor signed the

April 2011 performance review.

Rudolf Fitness Center Assistant Athletics Director Jose Hernandez and David

Martin exchanged e-mails following the April 28, 2011 performance review. In one

e-mail, Hernandez posed two questions to Martin. Hernandez asked Martin how the latter

could improve his performance to advance the interests of the fitness center. The second

question asked Martin how other Rudolf Fitness Center staff needed to change or

improve. Martin's response focused on his desire to develop a pool program, his

dissatisfaction with resistance to change from others, and a lack of teamwork among staff.

Martin did not mention any student safety concerns related to the lack of protective

padding in the basketball courts.

In a document dated August 16, 2011, an anonymous author, perhaps Jose

Hernandez, summarized in writing David Martin's April 2011 review. The document

lacks a header. The author identified four deficiencies in Martin's work performance and

correlating expectations and goals. The four highlighted deficits were a lack of

interpersonal and professional communication skills with coworkers, a lack of teamwork,

7

abrasive and insensitive written communications, and a neglect of job responsibilities.

After David Martin's April 28, 2011 performance review, Rudolf Fitness Center Assistant Athletics Director Jose Hernandez counseled Martin daily about his job performance, his need to follow protocol, and his interpersonal skills. According to Hernandez,

> [Martin] was a young man just removed from college at the time who was a challenge to work with. Mr. Martin did not like structure and felt like he could get the job done his own way. . . . Mr. Martin was very arrogant and simply did not want to get along with people.

CP at 120. Hernandez eventually consulted with Gonzaga University's Human Resources Office regarding Martin's job performance issues. Heather Murray, associate director of human resources, testified in a declaration that Hernandez continually coached Martin to take direction and follow protocol. Senior Associate Athletics Director Chris Standiford observed that David Martin resented Jose Hernandez being Martin's supervisor.

According to Rudolf Fitness Center Associate Director Shelly Radtke, who supervised David Martin, Martin lacked tact with employees and students and yelled at her on several occasions. Assistant Director Andrew Main testified that Martin lacked interpersonal skills. Main testified that Martin "liked to do things his own way, even if there were procedures in place that he was supposed to follow." CP at 170. Martin acknowledged he experienced difficulty with Rudolf Fitness Center Assistant Director

8

Kerri Conger because of attitudinal differences.

As part of David Martin's thesis project for his masters' program, Martin wrote a proposal to continue use of the Rudolf Fitness Center pool and use funds raised from enjoyment of the pool to purchase protective wall padding for the basketball courts. We assume that the Gonzaga University administration considered closing the pool, but no direct evidence confirms such. Martin wished the university to maintain a pool on campus for students. The record does not include Martin's written proposal.

David Martin submitted his pool and padding proposal to Rudolf Fitness Center Assistant Athletics Director Jose Hernandez and asked if he could submit the proposal to Senior Associate Athletics Director Chris Standiford. Standiford oversaw the fitness center budget. According to Martin, Hernandez granted him permission. During discovery, Hernandez denied that he granted Martin permission to share his proposal with Standiford. Hernandez testified that "[h]e cannot stop [David Martin] from going over there [to Standiford] and talking to our associate athletics director, but that is not the proper procedure, proper way to do it." CP at 75.

On February 29, 2012, David Martin sent his pool and padding proposal to Senior Associate Athletics Director Chris Standiford through an e-mail entitled "Future Pool Proposal." CP at 115. Martin requested a meeting with Standiford to discuss "a very

9

specific plan, along with other ideas, on how to generate revenue to keep the pool

operational and buy time for the future." CP at 115. Martin's cover e-mail did not

mention student safety concerns resulting from the lack of protective padding in the

basketball courts. Standiford responded to Martin on February 29:

> Unfortunately my schedule will not allow for a meeting before my departure tomorrow. It is more organizationally appropriate for you to provide Jose [Hernandez] with the proposal for consideration. If you already done this, and Jose supports the proposal, I would suggest he meet with Joel [Morgan] for further consideration and deliberation.
>
> I have asked Joel, and by extension Jose, that we do an analysis and program[m]atic review that demonstrates the relative vitality and necessity of the aquatic component as part of the Rudolf Fitness Center. Hopefully your work helps expedite that project as it is the most time sensitive. The response to that question is the primary focus and sole request at this time. The answer will lead to greater discussion and instruct us to what parameters and goals we can construct for that discussion and in response to Plant's concerns about the viability of further operation of the pool complex.
>
> Thanks for your work to date and that which still lies ahead.

CP at 114. Martin replied after work hours:

> I am aware that this is a time sensitive matter. In the politest possible way . . . according to our organizational layout in the Policies and Procedures Manual, pg. 6, there is no such line of communication or organization hierarchy established for the RFC [Rudolf Fitness Center] staff to follow. I have Jose's consent in this matter and I understand that you are an extremely busy individual, I wouldn't be asking for your time if I didn't plan on using it to the fullest. Imagine this as a "golden ticket" idea. Something that I don't want others corrupting or taking credit for. I would ask that you please meet with me and hear my thoughts on this matter. If it needs to wait until after you return, then so be it, but I have worked hard on

10

this and would appreciate your audience, and your audience alone.

CP at 114 (alteration in original). Standiford concluded that Martin, with this latest message, sought to generate additional income for himself contrary to Gonzaga University's mission. Following the Leap Day e-mail exchange, Chris Standiford contacted Jose Hernandez and Joel Morgan and asked them to contact human resources regarding David Martin.

According to David Martin, Chris Standiford directed him to forward the thesis proposal to Jose Hernandez for Hernandez to make the presentation in order to kill the proposal through administrative inaction. Hernandez lacked the knowledge and ability to make the presentation.

Rudolf Fitness Center Assistant Athletics Director Jose Hernandez scheduled a meeting for the following day, March 1, 2012, among Assistant Athletics Director Joel Morgan, David Martin, and Hernandez. Hernandez arranged the meeting in order to express disappointment to Martin for his disobeying the direction of Chris Standiford and to deliver Martin a letter of expectation. When Hernandez informed Martin of the meeting, Martin responded: "'You cannot make me go.'" CP at 121. Hernandez advised Martin to attend because his employment standing would otherwise worsen.

David Martin attended the March 1 meeting. Martin argued and interrupted Jose

11

Hernandez throughout the meeting. Martin repeatedly asked why his e-mail to Chris Standiford was inappropriate. Hernandez told Martin that Martin disregarded a direct order from Standiford when Standiford instructed Martin to submit his proposal to Hernandez and Morgan. Hernandez read to Martin a prepared statement. Joel Morgan demanded that Martin release his proposal to him, but Martin refused.

At the conclusion of the March 1 meeting, Jose Hernandez and Joel Morgan told David Martin that he would receive a letter of expectation and the two would evaluate his performance over the next week. Martin asked to leave the meeting. After the meeting concluded, Associate Director of Human Resources Heather Murray, who did not attend the meeting, assumed the responsibility for drafting the letter of expectation.

Within ten minutes after departing the March 1 meeting, David Martin located Rudolf Fitness Center Associate Director Shelly Radtke and requested to leave work early. According to Radtke, Martin approached her "hotter than a pistol" and yelled:

> "I need you to grant me permission to leave. . . . I can't be here. I have to get out of here and you need to document this."

CP at 163. Martin, who was scheduled to close the Rudolf Fitness Center that night, wished Fitness Center Assistant Director Andrew Main to substitute for him. Martin told Main that he was "[n]ot in a good state of mind." Main offered to close the facility for him. CP at 170. Martin did not seek permission from Jose Hernandez to leave work

12

early.

On March 1, Shelly Radtke texted Jose Hernandez to notify him that David Martin asked to leave early and, in an effort to avoid confrontation, she agreed. After receiving the text, Hernandez called Radtke, who relayed that a visibly upset Martin had already left the Rudolf Fitness Center. Hernandez and Morgan went to the fitness center to speak with Main. Main told them that Martin said: "Joel is upset I went over his head and Jose is a push over." CP at 216. Consequently, Morgan consulted with Heather Murray concerning Martin's actions during and after the meeting. Morgan and Murray agreed that Martin should be placed on administrative leave until further notice. According to Hernandez, the university placed Martin on administrative leave because he abandoned his duties and advised Shelly Radtke to tell Hernandez of his early absence.

On March 2, 2012, Jose Hernandez notified David Martin that Gonzaga University placed him on paid administrative leave. Hernandez instructed Martin that the terms of his leave forbad him to contact anyone at Gonzaga University except human resources staff and Hernandez.

David Martin states that, before his termination from employment, he was wrongfully accused of leaking information to *The Gonzaga Bulletin*, a Gonzaga University student publication. Martin does not identify the accuser or the date of the

13

accusation. Martin attached, to his declaration, a copy of a May 10, 2012 *Gonzaga Bulletin* article, entitled "Gym safety questioned as employee fired." CP at 38-39. We wonder if the attachment contains the entire article. Our copy of the article does not mention the dismissal of Martin or anyone else from employment. The article quotes "Martin" without mentioning his first name or position with the fieldhouse. CP at 39. The article also mentions Martin's "proposal," but does not identify the proposal. CP at 39. The article reads, in part:

> According to Martin, the issue of pads is brought up once a year at a meeting with facilities. He says he has been told multiple times that the gym meets requirements and code.
>
> . . . .
>
> Martin said that in writing his proposal he was not so much worried about the threat of a lawsuit as he was about the safety of the clients using the facilities at the RFC.

CP at 39.

In an important passage in Jose Hernandez's deposition, the following colloquy occurred:

> Q. Did you ever share with Mr. Standiford that you believed that Mr. Martin was leaking information about the pads with a reporter with *The Bulletin*, the student publication?
> A. I don't believe saying that.
> Q. Did you ever believe that Mr. Martin was responsible for sharing information that led to the articles shown in Exhibit 1?
> A. I don't . . . I'm not in a position to just say that he did.
> Q. I'm not asking you whether you're in the position. Did you

personally believe that Mr. Martin was sharing information with a reporter
from *The Bulletin*?

A. Not necessarily.

Q. What do you mean "not necessarily?"

A. That I don't believe that.

Q. Did you have any thoughts that he might have shared this
information with *The Bulletin* and the reporter?

A. Well, I can tell you this: One of the reporters told me that, in a
group, he overheard Mr. Martin talking about it.

Q. So did that cause you to believe that maybe Mr. Martin was the
person who was sharing information with the reporter?

A. Not necessarily.

Q. Did you ever share this conversation with Mr. Standiford or talk
to him about Mr. Martin being the person giving information to the
reporter?

A. Not exactly. I mean, why would I say something that I personally
didn't know?

CP at 76-77 (alteration in original).

On March 5, 2012, David Martin called Julia Bjordahl, the executive assistant to

Thayne McCulloh, president of Gonzaga University. Martin requested a meeting with

McCulloh to present a proposal. Bjordahl, at the direction of McCulloh, told Martin to

follow the chain of command within the Athletics Department.

A persistent David Martin followed his conversation with Julia Bjordahl with an e-

mail message on March 6. Because David Martin asserts that Gonzaga University

terminated his employment for raising safety concerns over the lack of wall padding, we

recite the entire e-mail that Martin wrote to Bjordahl:

15

Julia:

Here is the proposal for Dr. McCulloh. I should first be clear that I have put my job in jeopardy because of how much I care about the student. Many universities have their rec[reation] center fall under Student Life, not Athletics. Our Athletic Department deals specifically with the student-athlete and often forget[s] everyone deserves equal opportunity. I see firsthand, every day, the student's desires and voice not being heard. This proposal is a way to amplify their voice and provide a better, safer environment for them to be a part of. I believe they deserve the highest level of service we can provide, and I know from the past 4 years of work that we aren't close to that. This proposal encompasses the necessary improvements needed. I have additional notes, budgetary information, and am currently working on another long term plan for when the pool is no longer financially viable and have begun a backup plan for when we need more space in the fitness center to accommodate a larger enrollment. *I have seen areas that need attention and have voiced my concerns for our lack of future planning, and at times safety, to my direct supervisor Jose Hernandez over the past 4 years.* This proposal is my vision, which I believe coincides with the President's, for what the fitness center and student experience should be for years to come. I have presented my idea in my Masters programs (Sports Administration) and have been working alongside one of my professors to help consider my options. We had a feeling that it would not be easily accepted and that proposing any new change would meet it's [sic] obstacles. Everyone I have presented this idea to has loved it, but since there is a dollar amount attached to it, I want to make sure it goes where it's needed and not directly into a budget that we have no control over.

These funds are intended to provide for the student experience, for our own team growth and to create a wonderful work environment where our student staff can be better prepared for the future.

Thank you for your time.

CP at 100 (emphasis added). To repeat, we lack a copy of David Martin's written thesis

proposal. The e-mail to Bjordahl mentions no safety concerns related to the lack of

padding in the basketball courts.

Julia Bjordahl replied to the March 6 e-mail by reiterating to David Martin the policy of vetting the proposal with the next individual in the chain of command, who Bjordahl believed to be Athletics Director Mike Roth. Bjordahl forwarded her e-mail exchange to Mike Roth, who in turn forwarded the communication to Heather Murray, Dan Berryman, and Chris Standiford.

On March 7, 2012, a student sustained a serious head injury from running into the bare concrete wall in the Rudolf Fitness Center basketball court. An ambulance rushed the student to the hospital. The student suffered a concussion and required stitches.

On March 8, 2012, Gonzaga University terminated David Martin's employment. The termination letter stated that the university terminated Martin's employment for his failure to correct past performance issues identified in his April 2011 performance review and insubordination. According to David Martin, in a meeting wherein he was fired, Chris Standiford told him that one of the reasons for his termination was the belief that Martin gave information about student injuries taking place at the Rudolf Fitness Center to the Gonzaga University student newspaper. According to Chris Standiford, Gonzaga University did not fire Martin because of Martin's complaints about the lack of padding

17

on the basketball court walls. Standiford declares that the university fired Martin for his lack of professionalism and his insubordination that began as early as 2011.

On March 30, 2012, David Martin sent a six-page letter to Gonzaga University President Thayne McCulloh and Athletics Director Mike Roth. The message complained that, during his employment, he saw "a lack of responsiveness to safety issues at the Rudolf Fitness Center (RFC)." CP at 102. He again touted his pool plan, and, after his introductory paragraph, stated that his plan included:

> 1. Increased communication between athletic staff members who oversee RFC operations/expenditures and the staff who run the RFC. This would include monthly or quarterly joint staff meetings so that information could flow between our two groups. One safety concern for example, athletics could provide advanced notice of scheduled maintenance activities such as refinishing Fieldhouse floors so that RFC employee schedules could be adjusted to avoid prolonged exposure to flumes. These meetings would also allow RFC staff to bring emergent issues to the attention of multiple athletic staff members so that knowledge flowed up the chain of command rather than to a singular person who normally ignores it, or gets back to us far too late. Emergent safety concerns such as CPR/AED [cardiopulmonary resuscitation/automated external defibrillator] certification, to which less than 5 percent of the entire athletic department is certified (I witnessed this at our all department staff meeting in August when we took a poll. Only Steve Delong and I raised our hands[.] [T]his is out of 100+ people.)
> 2. Greater utilization of the swimming pool to generate funds so that the RFC staff could address emergent safety issues. The perception, and reality, is that repeated requests for safety improvements have gone unaddressed under the current organizational structure. To remedy this I proposed teaching WSI, CPR/AED & First Aid and Lifeguarding classes, for which I am certified, so that the RFC does not have to "butt heads" over purchases and that safety issues could be resolved rather than prolonged.

18

Even now we don't have the resources to replenish first aid kits before critical items are exhausted. My proposal would have generated a MINIMUM of $21,000 dollars in the first semester, with the potential for $40,000/semester by the beginning of 2014. This money would go back to where it belongs, i.e., immediate student needs. Under the proposal we could have paid for our own protective equipment in the gym and not have to fight those in the chain of command to justify funding our safety provisions.

3. An organizational restructuring so that the RFC and its manager, in this case Jose Hernandez, have some autonomy, including disciplinary actions, and reporting to a more appropriate supervisor than someone overseeing "facilities." Facilities is not the appropriate department overseeing student based programming. The RFC is so low on the chain of command our staff is powerless to do our job safely and correctly, leading to increased university liability and continuing student injuries. It is important that I make you aware that our repeated safety concerns have fallen on deaf ears. This is what prompted me to write the proposal in the first place.

CP at 102.

David Martin's March 30 epistle thereafter described his hostile meeting with Joel Morgan and Jose Hernandez, his suspension from employment, the need to directly present his proposal to those higher on the chain of command, universal praise of his plan, and fear that others would take credit for the plan. Martin continued:

I am an honest person. But what happened to me was very unfair, it undermined my credibility with the university, and what's worse . . . stripped me of years of friendship. I believe my termination was the result of a fabricated rumor to cover up the wrongful intimidation of a student who was looking to investigate the lack of padding on the walls of the Fieldhouse. As I mentioned earlier his investigative story was coincidental with my repeated attempts at getting protective padding for the students. I

19

want you to know this, I DID NOT LEAK ANY INFORMATION TO THE BULLETIN. I have been falsely accused of this and erroneously terminated for it.

The punishable offense in all of this was the intimidation tactics that were used on the student. These intimidation tactics were used to keep this student from publishing his story and are prohibited under Gonzaga's Personnel Policies. Additionally the student writer was threatened that if he should publish the story he and The Bulletin would be denied access to future stories involving athletics. A few days later Jose attempted to apologize to the student in an attempt to keep him from reporting Joel's threats. If Chris Standiford had not told me of this rumor during my termination meeting as part of his "You have been insubordinate in the past" speech, I would have never pieced this together. How can I be terminated for a rumor?

I am loyal. Loyal to my friends, loyal to my boss, and loyal to my employer. I make every effort to do things the right way. I was a boy scout. I was brought up by a Gonzaga alum, class of '78. I was raised to respect others and put people before one's self. This is why I take student safety and university liability very seriously, and by firing me a very dangerous message is sent to both students and RFC staff members. First, it's the notion that Gonzaga doesn't care about the student's safety and that somehow money is better spent elsewhere. Last, it's the "rat in a maze" concept. Bring an idea forth, and you're punished, try and do anything to draw attention to your cause and you're punished. Pretty soon the message is don't think outside the box. Productivity and [i]nnovation should be rewarded, not punished. President McCulloh talks all the time about this way of thinking and making Gonzaga a better place for the student; I was only trying to carry out his message.

. . . .

So, the question you should be asking yourself now is why did Joel respond the way that he did?

Evidently, sometime before I brought my plan forward to Jose a student from the GU [B]ulletin interviewed Jose about why there are no pads under the basketball hoops in the intramural courts. Coincidentally one of the examples I used in pitching my plan to Jose as to why we need increased communication between athletics and RFC staff is that our

20

repeated requests for pads have been denied. (I have mended more than my share of impact injuries from students hitting the wall during intramural basketball, and my pitch is that if RFC staff could be heard by more than one member of the athletic staff, i.e., Joel, then they might be able to get the safety items that the facility needs).

. . . .

So who made the decision to terminate and why?

I believe I was terminated by Chris based on Joel's unfounded allegations. Also, I was terminated the day after a student suffered a serious head injury by hitting the "pad-less" wall under the basketball hoops on the intramural courts. Coincidence? I think not.

CP at 103-05 (alterations in original). David Martin ended his letter by proposing that

Gonzaga University adopt his plan, rehire him, and give him a promotion.

Following David Martin's termination in 2012, the Athletics Department requested

a third assessment of the need for protective padding on the basketball court walls. Joel

Madsen, a risk manager at Gonzaga, recommended that protective pads be installed.

Chris Standiford approved the installation of the protection pads and the university

installed the pads in the Rudolf Fitness Center. The pads cost $18,000.

After David Martin's termination from employment and at Martin's request,

Gonzaga University provided Martin with a copy of his personnel file. In addition to an

employee's personnel file, Gonzaga maintains an employee relations file. Gonzaga does

not disclose whether it supplied Martin with a copy of his employee relations file.

After having received records from Gonzaga University, David Martin penned this

21

No. 34103-8-III
*Martin v. Gonzaga University*

letter to the university:

> Thank you for your prompt response to my request for a complete copy of my personnel file. This letter confirms receipt of my file by certified mail on April 4, 2012 and its contents which are as follows: [list of documents]
>
> . . . .
>
> Additionally, during each of my evaluations (2008, 2009 and 2010) I was required to sign acknowledging receipt of my supervisor's analysis of my work performance. I signed each of the evaluations I was given in 2008, 2009 and 2010; however, I do not recall having been given an evaluation in 2011. If there is a 2011 evaluation with my signature please send a copy of it for my records.
>
> Finally, are there any additional documents that I should be aware of in my personnel file?
>
> Thank you for your time.

CP at 211.

PROCEDURE

David Martin filed this lawsuit, against Gonzaga University, alleging that the university terminated his employment in violation of public policy for raising concerns about the lack of wall padding for the basketball court. Martin also alleged that Gonzaga University violated its statutory obligations when it declined to provide him with a complete copy of his personnel file following his discharge.

After extensive discovery, Gonzaga University filed a summary judgment motion seeking dismissal of David Martin's two causes of action. When opposing the summary judgment motion, Martin filed his own declaration. Among other testimony, Martin

22

posited in his declaration that "the only way to address the safety concerns for the students was to make sure that my [his] proposal and insistence that pads be installed was to bring it to the top." CP at 34.

In support of Gonzaga University's motion, Heather Murray, an employee in the university's Human Resources Office, signed a declaration. A paragraph in the declaration tersely responds to David Martin's action that the university failed to produce his personnel file. Murray averred:

> There are two separate files which are kept on employees: the employee relations file and a personnel file.

CP at 167. The trial court granted Gonzaga University summary judgment on both of Martin's claims.

## LAW AND ANALYSIS

### Summary Judgment

We summarize familiar principles of summary judgment jurisprudence. Summary judgment should be granted if the evidence establishes there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. CR 56(c); *Ruff v. County of King*, 125 Wn.2d 697, 703, 887 P.2d 886 (1995). To succeed on a summary judgment motion, the moving party must first show the absence of an issue of material fact. *Ingersoll v. DeBartolo, Inc.*, 123 Wn.2d 649, 654, 869 P.2d 1014 (1994).

A material fact is one in which the outcome of the litigation depends in whole or in part. *Morris v. McNicol*, 83 Wn.2d 491, 494, 519 P.2d 7 (1974). The court must construe all facts and reasonable inferences in the light most favorable to the nonmoving party. *Lybbert v. Grant County*, 141 Wn.2d 29, 34, 1 P.3d 1124 (2000). On appeal of summary judgment, the standard of review is de novo and the appellate court performs the same inquiry as the trial court. *Lybbert v. Grant County*, 141 Wn.2d at 34.

In summary judgment procedure, the moving party must first show the absence of an issue of material fact. *Ingersoll v. DeBartolo*, 123 Wn.2d at 654. The burden then shifts to the nonmoving party. *Ingersoll v. DeBartolo*, 123 Wn.2d at 654. To survive summary judgment, the nonmoving party must set forth specific facts that rebut the moving party's contentions and that posit a genuine issue as to a material fact. *Seiber v. Poulsbo Marine Center, Inc.*, 136 Wn. App. 731, 736-37, 150 P.3d 633 (2007). The nonmoving party may not rely on speculation or argumentative assertions, nor may it have its affidavits considered at face value. *Seiber v. Poulsbo Marine Center, Inc.*, 136 Wn. App. at 736. If the nonmoving party fails to offer sufficient evidence of an element essential to her case, the trial court should grant summary judgment. *Hines v. Data Line Systems, Inc.*, 114 Wn.2d 127, 148, 787 P.2d 8 (1990).

Wrongful Termination

24

We address David Martin's claim of wrongful discharge in violation of public policy first. On appeal, David Martin contends that he presented sufficient evidence to raise a genuine issue of material fact as to whether Gonzaga University fired him for raising safety concerns over the lack of protective wall padding in the Rudolf Fitness Center. We disagree. At a minimum, Gonzaga University presents uncontroverted facts that defeat the fourth element of the cause of action, the absence of an overriding justification.

In general, employees can quit or be fired for any reason under Washington state common law. *Gardner v. Loomis Armored Inc.*, 128 Wn.2d 931, 935, 913 P.2d 377 (1996). Courts, however, have created certain exceptions to the terminable-at-will doctrine. *Gardner v. Loomis Armored Inc.*, 128 Wn.2d at 935. One of these exceptions provides that employees may not be discharged for reasons that contravene public policy. *Gardner v. Loomis Armored Inc.*, 128 Wn.2d at 935.

Washington courts permit public policy tort actions in four situations: (1) when the employer fires an employee for refusing to commit an illegal act, (2) when the employer fires an employee for performing a public duty or obligation, such as serving on jury duty, (3) when an employer fires an employee for exercising a legal right or privilege, such as filing a workers' compensation claim, and (4) when an employer fires an employee in

25

retaliation for reporting employer misconduct. *Gardner v. Loomis Armored Inc.*, 128 Wn.2d at 936; *Dicomes v. State*, 113 Wn.2d 612, 618, 782 P.2d 1002 (1989). Martin argues his case falls under the fourth category.

The Washington Supreme Court in *Gardner v. Loomis Armored Inc.*, 128 Wn.2d at 941 (1996), adopted four elements, formulated by law professor Henry H. Perritt, Jr., that an employee must meet to satisfy a wrongful discharge in violation of public policy action: (1) the existence of a clear public policy (the clarity element), (2) discouraging the conduct in which the employee engaged would jeopardize the public policy (the jeopardy element), (3) the public-policy-linked conduct caused the dismissal (the causation element), and (4) the employer must not be able to offer an overriding justification for the dismissal (the absence of justification element). *Rickman v. Premera Blue Cross*, 184 Wn.2d 300, 310, 358 P.3d 1153 (2015); *Gardner v. Loomis Armored Inc.*, 128 Wn.2d at 941. Gonzaga University argues that David Martin fails to present a factual question with regard to all four elements.

*Clarity Element*

The employee carries the burden initially of proving the existence of a clear public policy. *Gardner v. Loomis Armored Inc.*, 128 Wn.2d at 941. The courts insist that the public policy at issue be judicially or legislatively recognized, emphasizing that the tort is

26

a narrow exception to the at-will doctrine and must be limited only to instances involving very clear violations of public policy. *Dicomes v. State*, 113 Wn.2d at 617. In determining whether a clear mandate of public policy is violated, courts should inquire whether the employer's conduct contravenes the letter or purpose of a constitutional, statutory, or regulatory provision or scheme. *Dicomes v. State*, 113 Wn.2d at 617. Prior judicial decisions may also establish the relevant public policy. *Dicomes v. State*, 113 Wn.2d at 617. The question of what constitutes a clear mandate of public policy is one of law. *Dicomes v. State*, 113 Wn.2d at 617.

David Martin claims Gonzaga University fired him for advocating the addition of padding to basketball court walls and for speaking to the Gonzaga University student press about accidents resulting from the lack of padding. Martin identifies student safety as the public policy he advocated. In turn, he cites to RCW 49.17.010 and RCW 49.12.010, which declare safe and healthy working conditions to be in the public interest and in the public welfare. He promotes WAC 296-823-100, which seeks to protect workers from exposure to blood and blood-borne pathogens. Martin identifies RCW 28B.112.005, which aims to prevent sexual violence and provide comfort and resources to victims of sexual assault and stalking. Finally, he mentions *Gardner v. Loomis Armored Inc.*, 128 Wn.2d at 941 (1996), which notes a broad public policy to protect life

27

and limb.

We question the relevance of David Martin's cited statutes, regulation, and decisional law. The beneficiaries of RCW 49.17.010, RCW 49.12.010, and WAC 296-823-100 are workers, not students. RCW 28B.112.005 addresses sexual violence, not sports safety. *Gardner v. Loomis Armored Inc.* concentrates on criminal statutes and David Martin does not contend Gonzaga University violated any criminal law.

We need not spend further time exploring statutes, regulations, or decisions to discern a public policy to protect college and university students from athletic injuries and blood-borne pathogens, however. During oral argument, Gonzaga University conceded that student safety constitutes a public policy. The university acknowledged that, if David Martin pursued student safety, he advanced a public policy. Wash. Court of Appeals oral argument, *Martin v. Gonzaga University*, No. 34103-8-III (May 4, 2017), at 15:45 to 16:30 (on file with court). Therefore, Gonzaga University's contention that Martin fails to satisfy the first element is more that David Martin never advocated student safety, rather than student safety being unrelated to Washington public policy.

We discern issues of fact as to whether David Martin advocated student safety. He presented testimony that he spoke to Jose Hernandez, if not others, about the need to procure padding for the basketball court walls. Jose Hernandez characterized Martin as

28

passionate about the necessity of pads. The *Gonzaga Bulletin* interviewed Martin on this topic because of numerous, including serious, injuries to students.

Gonzaga University also argues that David Martin advocated his own selfish interests, rather than the public interest. Washington law distinguishes between employee conduct motivated by purely private interests and conduct motivated by a concern for the welfare of the general public. *Dicomes v. State*, 113 Wn.2d at 620 (1989); *Thompson v. St. Regis Paper Co.*, 102 Wn.2d 219, 232, 685 P.2d 1081 (1984). We agree that undisputed facts establish that Martin, in part, sought to forward his own interests. At times, Martin focused on his pool proposal more than student safety and wanted full credit for the proposal. Nevertheless, the law does not preclude recovery under the tort of wrongful discharge when the employee sought to further his own welfare in addition to the public welfare. Issues of fact lie as to whether Martin also sought to benefit students and the university at large.

*Jeopardy Element*

The jeopardy element of the tort of wrongful discharge in violation of public policy has undergone modifications in recent years. *Rickman v. Premera Blue Cross*, 184 Wn.2d 300 (2015); *Rose v. Anderson Hay & Grain Co.*, 184 Wn.2d 268, 358 P.3d 1139 (2015); *Becker v. Community Health Systems, Inc.*, 182 Wn. App. 935, 332 P.3d 1085

29

(2014), *aff'd*, 184 Wn.2d 252, 359 P.3d 746 (2015). In *Rickman, Rose,* and *Becker,* the Supreme Court returned to the original formulation of the element as requiring a plaintiff to prove either his or her conduct directly related to the public policy or the conduct was necessary for the effective enforcement of that policy. *Rickman v. Premera Blue Cross,* 184 Wn.2d at 310; *Gardner v. Loomis Armored, Inc.,* 128 Wn.2d at 945. When a direct relationship holds between the employee's conduct and the public policy, the employer's discharge of the employee for engaging in that conduct inherently implicates the public policy. *Rose v. Anderson Hay & Grain. Co.,* 184 Wn.2d at 284.

In *Rose v. Anderson Hay & Grain Co.,* 184 Wn.2d at 281 (2015), our Supreme Court disavowed the former rule that a plaintiff must establish the inadequacy of other remedies in the alternative to a civil suit for damages in order to meet the jeopardy element of the tort for wrongful discharge against public policy. The high court thereby overruled *Hubbard v. Spokane County,* 146 Wn.2d 699, 50 P.3d 602 (2002); *Cudney v. ALSCO, Inc.,* 172 Wn.2d 524, 259 P.3d 244 (2011), and *Korslund v. DynCorp Tri-Cities Services, Inc.,* 156 Wn.2d 168, 125 P.3d 119 (2005). No longer does the existence of other nonexclusive statutory remedies preclude a plaintiff from recovery. *Rose v. Anderson Hay & Grain Co.,* 184 Wn.2d at 274 (2015).

Although Gonzaga University claims that David Martin failed to establish the

jeopardy element of the public policy tort, the university presents no argument to defeat

the application of the element. We hold that Martin presents an issue of fact to survive

summary judgment as to the jeopardy element. David Martin sought to address safety

concerns. His expression of his concerns directly related to the public policy of safety of

university students. Terminating or otherwise punishing an employee who shares

concerns about unsafe conditions directly jeopardizes the public policy interest in

ensuring safety.

*Causation Element*

Causation in a wrongful discharge claim is not an all or nothing proposition.

*Rickman v. Premera Blue Cross*, 184 Wn.2d at 314 (2015). The employee need not

attempt to prove the employer's sole motivation was retaliation. *Wilmot v. Kaiser*

*Aluminum and Chemical Corp.*, 118 Wn.2d 46, 70, 821 P.2d 18 (1991). Instead, the

employee must produce evidence that the actions in furtherance of public policy were a

cause of the firing, and the employee may do so by circumstantial evidence. *Rickman v.*

*Premera Blue Cross*, 184 Wn.2d at 314. This test asks whether the employee's conduct

in furthering a public policy was a substantial factor motivating the employer to discharge

the employee. *Rickman v. Premera Blue Cross*, 184 Wn.2d at 314.

Ordinarily, the prima facie case must, in the nature of things, be shown by

31

circumstantial evidence, since the employer is not apt to announce retaliation as his motive. *Wilmot v. Kaiser Aluminum and Chemical Corp.*, 118 Wn.2d at 69. Proximity in time between the public-policy-linked conduct and the firing coupled with evidence of satisfactory work performance and supervisory evaluations may be persuasive in establishing causation. *Wilmot v. Kaiser Aluminum and Chemical Corp.*, 118 Wn.2d at 69. Whether a plaintiff satisfied the causation element is a question of fact. *Havens v. C&D Plastics, Inc.*, 124 Wn.2d 158, 177-79, 876 P.2d 435 (1994).

We recognize an issue of fact as to whether Gonzaga University terminated David Martin's employment because of his advocacy of student safety. Martin testified that Chris Standiford told him that one of the reasons for the firing was the rumor that Martin afforded the student newspaper information about student injuries. Martin did not assert this factual claim for the first time in this suit. In his March 30, 2012, letter to Gonzaga University President Thayne McCulloh and Athletics Director Mike Roth, Martin mentioned his termination being based in part on rumors of his conveyance of evidence of student injuries. Reasonable inferences from the evidence support a finding that the university fired Martin not simply for speaking to the press, but also because the content of his leak concerned padding in the fieldhouse.

Gonzaga University characterizes David Martin's theory of the leaking rumor as

32

supposition. Nevertheless, for purposes of a summary judgment motion, we must accept Martin's testimony as the truth. Based on this testimony, the man likely most responsible for the firing of Martin conceded a reason was advocating the safety of students. Gonzaga University also contends that the undisputed facts show that David Martin never raised a concern about the walls in the Rudolf Fitness Center until after his firing. Overwhelming evidence, including the deposition testimony of Jose Hernandez, counters this contention.

Gonzaga University also emphasizes that the facts establish that other employees for more than five years also discussed the need for wall padding. The university never fired any of the other employees for raising this concern. We recognize these accentuated facts as compelling, but the facts should be argued to the trier of fact, when other evidence supports David Martin's complaints as a cause of his employment termination. We also note the absence of evidence that another employee spoke to the school newspaper about the need for the padding.

Finally, Gonzaga University highlights other legitimate reasons that support David Martin's firing. We will consider facts supporting those reasons under the element of an overriding justification.

*Overriding Justification Element*

We move to the final of the four elements of the tort of wrongful discharge in violation of public policy, the absence of another justifiable reason for termination from employment. In the context of this appeal, the fourth component looms as the most difficult to resolve. In order to methodically address this element, we pose the following eight questions mainly legal in nature. First, which party carries the burden of showing overriding justification? Second, must the overriding justification motivate the employer in firing the employee for the employer to avoid liability? Third, if the answer to the second question is affirmative, must the overriding justification supersede the unlawful reason for firing in regards to what motivated the employer? Stated differently, must the employer be more motivated by the overriding justification than the public policy violating reason for termination? Fourth, what reasons for termination from employment qualify as an overriding justification? In this appeal, we ask whether insubordination qualifies as an overriding justification. Fifth, must the overriding justification supersede the unlawful reason for the firing in importance under the law or under public policy? This fifth question asks if the court measures and weighs the relative strengths of the overriding justification and the violated public policy. Sixth, if the answer to the fifth question is in the affirmative, does the court compare the public policy with the employer

34

justification in the abstract or does the court consider the importance of the public policy and employer justification within the context of the facts in the case? Seventh, is the element of overriding justification an element for the court as a matter of law to resolve or for the trier of fact to decide? Eighth and the ultimate question, does David Martin present an issue of fact with regard to the overriding justification element that survives Gonzaga University's summary judgment motion?

We find no easy answer to most of our eight questions such that the Supreme Court may wish to accept review to clarify the overriding justification element. Most, if not all, Washington decisions since the seminal case of *Gardner v. Loomis Armored, Inc.*, 128 Wn.2d 931 (1996), note the absence of an overriding justification as an element of wrongful discharge in violation of public policy. Nevertheless, only *Gardner* and *Wahl v. Dash Point Family Dental Clinic, Inc.*, 144 Wn. App. 34, 181 P.3d 864 (2008) discuss the element in any depth. Foreign case law helps little because only Guam, Ohio, and Utah have adopted Henry H. Perritt, Jr.'s, four elements of the tort of wrongful discharge in violation of public policy, including the overriding justification element. *Becker v. Community Health Systems, Inc.*, 182 Wn. App. at 963 (2014). Whether a fourth jurisdiction, Iowa, has adopted the four-part analysis is questionable because the state may subsume the alternative or overriding justification element into the third element of

causation. *Raymond v. U.S.A. Healthcare Center-Fort Dodge, LLC*, 468 F. Supp. 2d 1047, 1057 (N.D. Iowa 2006); *Fitzgerald v. Salsbury Chemical, Inc.*, 613 N.W.2d 275, 282 (Iowa 2000). Ohio courts have issued oodles of cases, some published and many unpublished, that discuss briefly the overriding justification, and, thus, we occasionally mention Ohio law.

Before answering the eight questions, we state and restate the rule of overriding justification. The "absence of justification" element examines whether the employer can offer an overriding justification for the discharge from employment despite the employee's conduct furthering public policy. *Gardner v. Loomis Armored, Inc.*, 128 Wn.2d 931 (1996). Stated marginally different, the "absence of justification" element examines whether the employer has an overriding reason for terminating the employee despite the employee's public-policy-linked conduct. *Gardner v. Loomis Armored, Inc.*, 128 Wn.2d at 947. The fourth element of the public policy tort acknowledges that some public policies, even if clearly mandated, are not strong enough to warrant interfering with an employer's personnel management. *Gardner v. Loomis Armored Inc.*, 128 Wn.2d at 947.

Our first question asks which party carries the burden of proof for the element of overriding justification. Washington cases read that the employee in a wrongful

36

discharge suit must fulfill four elements, one of which is the "absence of justification" element. *Rickman v. Premera Blue Cross*, 184 Wn.2d at 310 (2015); *Gardner v. Loomis Armored Inc.*, 128 Wn.2d at 941. This statement of the rule suggests that the plaintiff employee carries the burden of proving a negative, the nonexistence of another legitimate reason for his or her firing. Nevertheless, some cases declare that justification for a discharge is an affirmative defense. *Blinka v. Washington State Bar Association*, 109 Wn. App. 575, 588-89, 36 P.3d 1094 (2001). According to these cases, once a plaintiff fulfills the clarity element and a question of fact remains as to the jeopardy and causation elements, the burden shifts to the employer to show an overriding justification for the employee's discharge. *Rickman v. Premera Blue Cross*, 184 Wn.2d at 314; *Hubbard v. Spokane County*, 146 Wn.2d at 718 (2002).

The Washington rule in wrongful discharge cases may eventually follow the rules of persuasion in employment discrimination and retaliation cases. According to *Brownfield v. City of Yakima*, 178 Wn. App. 850, 873, 316 P.3d 520 (2013):

> An employee claiming discrimination must first prove a prima facie case of discrimination and, if he or she does so, then the burden shifts to the employer to present evidence suggesting a nondiscriminatory reason for [the termination]. If the employer sustains its burden, the employee must then demonstrate that the reasons given by the employer are pretext for discrimination.

(Alteration in original) (internal quotation marks and citations omitted); *See also Renz v.*

37

*Spokane Eye Clinic, PS*, 114 Wn. App. 611, 618, 60 P.3d 106 (2002). Accordingly, the

employer may carry the burden of producing some evidence of an overriding justification,

at which time the burden returns to the employee to prove by a preponderance of evidence

that the employer's stated reason is a pretext or the stated reason does not override the

public policy violated by the discharge. *Rickman v. Premera Blue Cross*, one of a triad of

recent high court decisions, does not discuss whether the burden returns to the employee

once the employer posits an overriding justification.

We need not identify the bearer or resolve the nature of the burden of proof

because, no matter who carries the burden and the extent of the burden, we hold that

Gonzaga University is entitled to summary judgment on the justification element.

Imposing the burden of proof on the employer does not necessarily mean the employer

may not gain summary judgment on the element. A defendant, even an employer in an

employment case, may gain summary judgment by establishing an uncontroverted

affirmative defense. *Thornton v. Federal Express Corp.*, 530 F.3d 451, 457-58 (6th Cir.

2008); *Fitzgerald v. Salsbury Chemical, Inc.*, 613 N.W.2d at 282.

We next visit the second question of whether the employer must be motivated by

the overriding justification when discharging the employee from employment in order to

avoid liability. This question becomes relevant if facts show that Gonzaga University

38

knew of the insubordination of David Martin, but fired David Martin only because of his advocacy of student safety. Under these facts, the individual or individuals terminating Martin's employment knew about, but cared nothing about, the insubordination of Martin and only wished to retaliate against Martin because of his raising safety concerns or speaking to the student newspaper. We answer the second question in the negative. The university may avoid liability if insubordination constitutes a justifying reason under the law and overrides the advocacy of safety concerns regardless of whether insubordination motivated the firing.

We secure our decision, freeing the employer from showing the overriding justification prompted its decision to fire, primarily on the "after-acquired evidence" doctrine. This doctrine precludes or limits an employee from receiving remedies for wrongful discharge if the employer later discovers evidence of wrongdoing that would have led to the employee's termination had the employer known of the misconduct. *Lodis v. Corbis Holdings, Inc.*, 192 Wn. App. 30, 60, 366 P.3d 1246 (2015), *review denied*, 185 Wn.2d 1038, 377 P.3d 744 (2016); *Janson v. North Valley Hospital*, 93 Wn. App. 892, 900, 971 P.2d 67 (1999). If the employer may limit its liability with evidence of insubordination discovered after the termination from employment, the employer should be able to limit its liability with evidence known at the time of the discharge, even if the

39

employer only utilized public policy defying grounds. We discern no reason to distinguish the two factual scenarios for purposes of employer liability. Under each circumstance, the employee's misconduct retrospectively substantiated the termination.

Absolving the employer from showing the alternative justification to be a motivating factor may conflict with the causation element. Under our holding, the employer still prevails even if the public policy was a substantial factor in the firing, and the third element only requires proof that the employee's furtherance of public policy constituted a substantial factor in the discharge. The overriding justification element assumes that an unlawful reason for the firing was a substantial factor, but another predominant reason also justified the termination.

A federal court, applying Iowa law, recognized the four element Henry H. Perritt Jr. test, including the fourth element of overriding justification. *Raymond v. U.S.A. Healthcare Center-Fort Dodge, LLC*, 468 F. Supp. 2d at 1058-59. Nevertheless, the court collapsed the overriding justification element into the causation element. The court reasoned that whether or not the employer had adequate alternative justifications for its action is necessarily relevant to whether or not the adverse action against the plaintiff was "caused" by the plaintiff's protected activity.

The *Raymond* court's reasoning conflicts with our determination that the

overriding justification need not be a motivating factor. Nevertheless, we observe that the

Washington Supreme Court holds fast to *Gardner*'s and Perritt's four elements of

wrongful discharge in violation of public policy, including the overriding justification

element. *Rickman v. Premera Blue Cross*, 184 Wn.2d 300 (2015); *Rose v. Anderson Hay*

*& Grain Co.*, 184 Wn.2d 268 (2015); *Becker v. Community Health Systems, Inc.*, 184

Wn.2d 252 (2015). Since the overriding justification element must be met in addition to

the element of causation, even if advocating a public policy was a substantial cause of the

termination, the employer avoids liability if another reason justified termination from

employment. The employee showing retaliation as a substantial factor may not suffice.

Otherwise, Washington would not insist on the fourth discrete element of overriding

justification.

Since we conclude that the overriding justification need not motivate the

employer's firing of the employee, we do not answer the third question regarding whether

the employer must be more motivated by the overriding justification than the public

policy violating reason for termination to prevail. We move to the fourth question of

what reasons for employment termination qualify as an overriding justification. We focus

first on the word "justification" and will focus later on the word "overriding." Gonzaga

University justifies the firing of David Martin by his insubordination when he forwarded

41

his pool proposal to officials above his chain of command in violation of an order, he abandoned his job because of anger resulting from a scolding, and he contacted university officials in violation of his leave of absence.

Washington courts have not defined or presented a list of what constitutes a "justification" for purposes of ending an employee's employment despite public policy concerns. We rely on the law in other employment case settings and, in part, in other states. The anti-retaliation law does not immunize the employee from discharge for past or present inadequacies, unsatisfactory performance, or insubordination. *Hulme v. Barrett*, 480 N.W.2d 40, 43 (Iowa 1992). An employee is bound to obey the direct order of his or her employer or risk being discharged for insubordination. *Empiregas, Inc. of Kosciusko v. Bain*, 599 So. 2d 971, 974 (Miss. 1992). Insubordination is defined as a willful disregard of express or implied direction or a defiant attitude. *Dixon v. Stoam Industries, Inc.*, 216 S.W.3d 688, 693 (Mo. Ct. App. 2007). A refusal to comply with a lawful and reasonable directive to attend a meeting may constitute insubordination. *Custom Hardware Engineering & Consulting, Inc. v. Dowell*, 919 F. Supp. 2d 1018, 1034-35 (E.D. Mo. 2013). One Washington decision recognizes that insubordination, in the form of failing to submit to a physical examination, constitutes justifiable cause to fire an employee, despite a claim of employment discrimination. *Brownfield v. City of*

42

*Yakima*, 178 Wn. App. at 873-75 (2013).

Henry H. Perritt, Jr., identifies the fourth element of the public policy tort as the lack of an "overriding legitimate *business* justification." Henry H. Perritt, Jr. *The Future of Wrongful Dismissal Claims: Where Does Employer Self Interest Lie?*, 58 U. CIN. L. REV. 397, 399 (1989) (emphasis added). Ohio decisions also insert the word "business" when expressing the element. *Jaber v. FirstMerit Corp.*, 2017-Ohio-277, ___ N.E.3d ___, (Ct. App.); *Vitatoe v. Lawrence Industries, Inc.*, 153 Ohio App. 3d 609, 795 N.E.2d 125, 132-33 (2003); *Wiegerig v. Timken Co.*, 144 Ohio App. 3d 664, 761 N.E.2d 118, 125 (2001). Washington's statement of the rule does not incorporate the expression "business." *Gardner v. Loomis Armored, Inc.*, 128 Wn.2d 931 (1996); *Rickman v. Premera Blue Cross*, 184 Wn.2d 300 (2015); *Rose v. Anderson Hay & Grain Co.*, 184 Wn.2d 268 (2015); *Becker v. Community Health Systems, Inc.*, 184 Wn.2d 252 (2015).

One might argue that, because of the omission of the term "business," Washington law requires the employer to advance a societal or public interest rationalization, rather than a selfish economic reason, to satisfy the final element of overriding justification. We disagree. Our Washington Supreme Court evinces a devotion to Perritt's formulation of the tort. The employer's justification will almost always be based on economic needs. In *Gardner*, the Supreme Court mentioned that some public policies are not strong enough

to warrant interfering with an "employers' personnel management." *Gardner v. Loomis Armored Inc.*, 128 Wn.2d at 947. The *Gardner* court considered the employer's need for insurance, a selfish business need, as a justification, although the need did not override the relevant public policy.

The undisputed facts establish that David Martin persistently and self-interestedly promoted himself and his thesis that sought to keep open a pool in the Rudolf Fitness Center. The saving of the pool did not advance any public policy. While promoting this pool, he repeatedly disobeyed directives from his superiors to follow a chain of command. He heatedly left a meeting and then abandoned his duties to close the center. While on leave, he disobeyed a directive not to contact employees of Gonzaga University other than the employees in the Human Resource Office and Jose Hernandez. He telephoned and e-mailed the Gonzaga University president, through the president's assistant. Martin's earlier job performance evaluations showed him to lack interpersonal and professional communication skills with coworkers, issue abrasive and insensitive written communications, and neglect job responsibilities. Martin resented supervision. David Martin presents no testimony that counter these facts. Martin's own written communications establish these facts.

44

We hold that insubordination is a qualifying justification for purposes of element four of the tort of wrongful discharge in violation of public policy. We also conclude that the undisputed facts establish insubordination by David Martin.

We move to the fifth question of whether the justification must supersede the unlawful reason for the firing in importance under the law or under public policy in order to succeed as an overriding justification. To repeat, this fifth question asks if the court measures and weighs the policy strength between the overriding justification and the violation of the public policy. We answer in the affirmative.

We observe that the overriding justification may not be insubordination by refusing to obey an order to engage in unlawful conduct, since the employer should not have given the order. *Lins v. Children's Discovery Centers of America, Inc.*, 95 Wn. App. 486, 494, 976 P.2d 168 (1999). For example, Gonzaga University could not claim an alternative justification if it fired David Martin for disobeying an order to hush with regard to a safety hazard. But David Martin's insubordination went further.

The "absence of justification" element examines whether the employer has an overriding reason for terminating the employee despite the employee's public-policy-linked conduct. *Gardner v. Loomis Armored, Inc.*, 128 Wn.2d at 947 (1996). In the lay dictionary, "overriding" means "[m]ore important than any other considerations."

45

OXFORD ENGLISH DICTIONARY ONLINE,

https://en.oxforddictionaries.com/definition/overriding (last visited Aug. 30, 2017). This

justification element acknowledges that some public policies, even if clearly mandated,

are not strong enough to warrant interfering with employers' personnel management.

*Gardner v. Loomis Armored, Inc.*, 128 Wn.2d at 947 (1996).

The only Washington decision addressing in depth the element of overriding

justification is the seminal decision of *Gardner v. Loomis Armored, Inc.*, 128 Wn.2d 931.

Loomis Armored fired Kevin Gardner after he abandoned his armored car to rescue a

female branch bank manager chased by a man with a knife. Loomis' policy precluded

any armored car driver from leaving the car unattended. The Supreme Court held the

firing violated Washington's fundamental policy of preservation of life. Loomis argued,

however, that it possessed an overriding reason for terminating the employee despite the

employee's public policy linked conduct. Loomis cited an incident when an armored car

driver exited the truck in response to his partner being robbed. The robber shot and killed

the driver. Loomis also worried about robbers counterfeiting an attack in order to lure the

driver out of the truck. Finally, Loomis noted that its insurance policy may not cover a

loss if a driver leaves a truck unattended.

The *Gardner* court wrote that it must balance the public policies raised by Kevin

Gardner against Loomis Armored's legitimate interest in maintaining a safe workplace and determine whether those public policies outweighed Loomis' concerns. Gardner advanced the Good Samaritan principle as a sufficient policy to override Loomis' justification. The court rejected a broad reading of the Biblical admonition because an employer's interests, however legitimate, would be subjugated to a plethora of employee excuses. A delivery person could stop to aid every motorist with car trouble, no matter how severe the consequences to the employer in terms of missed delivery deadlines. Nevertheless, the narrow public policy encouraging citizens to rescue persons from life threatening situations clearly evinced a fundamental societal interest of greater importance than the Good Samaritan doctrine. The waiver of most criminal and tort penalties stemming from conduct necessarily committed in the course of saving a life illustrated the value attached to such acts of heroism. Since society placed the rescue of a life above constitutional rights and above the criminal code, such conduct rose above a company's work rule.

The only other Washington decision addressing the overriding justification element is *Wahl v. Dash Point Family Dental Clinic, Inc.*, 144 Wn. App. 34 (2008). The trial court, in a bench trial, ruled in favor of employee Candace Wahl on her wrongful discharge in violation of public policy claim. Wahl presented testimony that her dentist

47

boss fired her for failing to accept his sexual advances. On appeal, the boss, Don Moore, argued he held an overriding justification for the termination from employment. He contended Wahl's performance was substandard and that he gave Wahl several reprimands concerning her poor performance. This court affirmed the trial court judgment in favor of Wahl, since the evidence showed that the claim of substandard performance was a pretext and Moore wrote the letters of reprimand after the firing.

Based on *Gardner v. Loomis Armored, Inc.*, 128 Wn.2d 931 (1996), we hold that the court must weigh the importance of the public policy asserted by the employee and the justification for firing advanced by the employer. *Gardner* unfortunately provides no guidance as to a comparison and measurement of the strength of the public policy and the employer justification.

Our sixth question is whether we compare the strength of the public policy with the overriding justification in the abstract or whether we measure the weight of both within the context of the facts of the appeal. If we kept our analysis in the abstract, we would ponder the theoretical importance of student safety compared to an employer's interest in dismissing an insubordinate employee. We might conclude that student safety supersedes the employer's interest in an obedient employee. Nevertheless, a different outcome might ensue if we consider all of the facts concerning David Martin's conduct

48

and his relationship with Gonzaga University in light of the values of student safety and a cooperative employee.

We decide to assess the comparative worth of student safety and a subordinate worker within the context of the case's circumstances. Student safety and insubordination exist in degrees, such that the context is important. When assessing the overriding justification in *Gardner v. Loomis Armored, Inc.*, 128 Wn.2d 931 (1996) and *Wahl v. Dash Point Family Dental Clinic, Inc.*, 144 Wn. App. 34 (2008), the Washington courts analyzed the specific facts of the case in light of the public policy and employer justification. In *Gardner*, when assessing whether the saving of human lives overrode the employer's goals of employee safety, safekeeping of large sums of money, and insurance coverage, the Supreme Court noted peculiar facts of the case. Those facts included Kevin Gardner's partner being present inside the bank and Loomis Armored failing to identify the terms of its insurance policy.

Our seventh question requires us to probe whether the weighing of the public policy and the employer justification should be performed by the court as a matter of law or by the trier of fact. Ohio decisions declare that the clarity and jeopardy elements of the Perritt test are questions of law to be determined by the court, while the causation and overriding justification elements are factual issues to be decided by a jury. *Jaber v.*

49

*FirstMerit Corp.*, 2017-Ohio-277, ___ N.E.3d ___ (Ct. App.); *Trayer v. Estate of Klopfenstein*, 2015-Ohio-5048, 53 N.E.3d 851, 855 (Ct. App.); *Wiegerig v. Timken Co.*, 144 Ohio App. 3d 664, 761 N.E.2d 118, 125 (2001).

We question the Ohio rule. We know of no Washington decision that directs a jury to measure the strength of a public policy, let alone compare that strength to private interests. We note that courts typically reserve to themselves the task of weighing the legal importance of policies and interests, including within the setting of constitutional rights. *City of Bellevue v. Lee*, 166 Wn.2d 581, 585, 210 P.3d 1011 (2009) (due process); *American Legion Post #149 v. Department of Health*, 164 Wn.2d 570, 608-09, 192 P.3d 306 (2008) (equal protection); *T.S. v. Boy Scouts of America*, 157 Wn.2d 416, 425, 138 P.3d 1053 (2006) (First Amendment associational rights); *Roth v. Veteran's Administration of Government of United States*, 856 F.2d 1401, 1407 (9th Cir. 1988) (public employee's right to free speech). We doubt the ability of a jury of laypeople to balance legal polices with private interests. In *Gardner v. Loomis Armored, Inc.*, 128 Wn.2d 931 (1996), the Supreme Court conducted its own weighing of the public policy furthered by the employee's conduct and the employer's interests. The court held, presumably as a matter of law, that the policy of saving another's life superseded the employer's policy of employee safety.

50

We observe that, assuming the fulfillment of the overriding justification element is for the court, the court may still need to conduct a factual hearing before completing its decision. Nevertheless, we need not resolve whether the court should solely analyze the overriding justification element in all cases and whether a factual hearing is desired for this appeal. We withhold from trial the weighing of the public and employer interests in this appeal because of the unchallenged evidence of noteworthy insubordination by David Martin.

We have several times previously answered the eighth and final question of whether David Martin presents sufficient evidence to defeat Gonzaga University's summary judgment motion. Our conclusion that the overriding justification need not have motivated the employer when terminating the employee simplifies answering this final question. We affirm the trial court on the basis that David Martin presents no issues of fact defeating Gonzaga University's overriding justification.

The facts before the court present two lines of conduct of David Martin that sometimes intertwined yet presented distinct grounds for the termination of Martin's employment. On the one hand, Martin sought to procure padding for the basketball walls in order to promote student safety. Student safety is an important public policy. Nevertheless, the evidence is vague and often disputed as to when and how Martin

51

advocated the padding. In the days before his termination from employment, the record shows no advocacy of safety for students. Other employees also alerted the administration to the danger of the unpadded walls. Others may not have expressed safety concerns to the *Gonzaga Bulletin*, but the *Bulletin* published its article after the dismissal of Martin from employment. The university consulted an expert, who recommended the addition of padding. The university eventually installed the padding.

The undisputed facts establish that David Martin promoted himself and his thesis that sought to keep a pool in the Rudolf Fitness Center open. The saving of the pool did not advance any public policy. Martin did not wish to conform to a chain of command when espousing his proposal because he thought only he could properly present his proposal and he did not want anyone to steal his golden ticket. While promoting this pool, he repeatedly disobeyed directives from his superiors. When told to attend a meeting to discuss his disobedience, Martin belligerently protested the need to appear. When counseled regarding his disobedience, he heatedly left the meeting, abandoned his duties, and insisted that a co-employee complete his tasks. While on leave, he disobeyed a directive not to contact other employees of Gonzaga University. He persisted on contacting the Gonzaga University president. He refused to heed the presidential assistant's direction to follow protocol.

52

David Martin's earlier job performance evaluations showed him to lack interpersonal and professional communication skills with coworkers, issue abrasive and insensitive written communications, and neglect job responsibilities. His conduct immediately preceding his dismissal confirmed these observations. Martin resented supervision. After his discharge, he contacted Gonzaga University's president and athletics director and, instead of apologizing for insubordination, he criticized his superiors, lectured about restructuring the Athletics Department, and suggested he be promoted. A business and a university cannot effectively function when an employee continually and angrily flaunts the directives of his supervisor and interrupts the university president to advocate the employee's interests. Even if Gonzaga University officials sought to retaliate against David Martin for his raising of safety concerns, the undisputed facts confirm that an overriding justification validated the dismissal from employment.

## Personnel File

David Martin brings a second cause of action. He contends that Gonzaga University failed to provide him, when requested, a complete copy of his personnel file in violation of RCW 49.12.250.

RCW 49.12.240 and .250 control. The former statute reads:

> Every employer shall, at least annually, upon the request of an employee, permit that employee to inspect any or all of his or her own personnel file(s).

The latter statute declares, in relevant part:

> (1) Each employer shall make such file(s) available locally within a reasonable period of time after the employee requests the file(s).

RCW 49.12 does not define "personnel file."

Gonzaga University, in support of affirming the trial court's ruling, argues that it satisfied David Martin's request by making the file available to him. Nevertheless, the facts presented by the university do not confirm this contention. Heather Murray, an employee of the university tersely declared: "There are two separate files which are kept on employees: the employee relations file and a personnel file." CP at 167. The declaration does not verify that the university permitted Martin access to any papers or any file. In April 2012, David Martin wrote a letter to Gonzaga University that confirmed he received some documents. Nevertheless, the letter also asked if Martin received all of the papers in his personnel file. The record shows no response from the university.

Heather Murray's declaration raises more questions than it answers. The questions include: Why does the university keeps two separate files? What types of documents are placed in the respective files? Do documents in both files impact the employee's employment status? Did Gonzaga University maintain two distinct files for David

54

Martin? From what file or files did the documents received by David Martin come? If the university withheld access to some documents found in either or both files, on what grounds did the university justify the withholding?

Gonzaga University, as the movant, bears the initial burden of showing the absence of an issue of material fact. *Ingersoll v. DeBartolo, Inc.*, 123 Wn.2d at 654 (1994). When, because of unanswered factual questions, this court cannot determine whether genuine issues of material fact require a trial, this court will vacate any summary judgment order and remand for further proceedings. *Kilcullen v. Calbom & Schwab, PSC*, 177 Wn. App. 195, 202, 312 P.3d 60 (2013). We follow this principle and vacate the summary judgment order dismissing David Martin's personnel file claim.

Our dissenting brother would resolve the personnel file cause of action on the basis that RCW 49.12.240 and .250 does not permit a private action. The dissenter may be correct, but we choose to avoid this thorny question if possible. We also choose to sidestep the question of what constitutes a "personnel file" for purposes of RCW 49.12. If Gonzaga University can show that it produced all requested records, we circumvent the two questions. We also note that, at the least, contrary to the dissenter's analysis, the employee may be able to gain the remedy of production of the records through court action.

No. 34103-8-III
*Martin v. Gonzaga University*

CONCLUSION

We affirm the trial court's summary judgment order dismissing David Martin's claim of wrongful discharge in violation of public policy. Undisputed facts establish that Gonzaga University possessed an overriding justification to terminate Martin's employment. We vacate and remand for further proceedings the summary judgment order dismissing Martin's claim that Gonzaga University failed to produce all of his personnel file on his request.

Fearing, C.J.

56

No. 34103-8-III

PENNELL, J. (concurring) — I agree there are material issues of fact regarding David Martin's personnel file claims. I also agree Gonzaga University is entitled to summary judgment on Mr. Martin's wrongful termination claim. However, I disagree as to the basis. I find summary judgment appropriate because Mr. Martin has not alleged sufficient facts on causation.

Mr. Martin argues he was fired for voicing safety complaints about the need for padding on the gymnasium walls. Specifically, he claims he was punished for raising the issue with Gonzaga's Senior Associate Athletics Director Chris Standiford and President Thayne McCulloh. The record does not support this claim.

Mr. Martin is unable to point to any evidence demonstrating he contacted Mr. Standiford or Dr. McCulloh about gymnasium padding. Instead, Mr. Martin's e-mail communications focused on his proposal for a swimming pool. In his initial e-mail to Mr. Standiford, Mr. Martin said the "ultimate goal" of the proposal he wished to push with the administration was to "keep a pool on campus for the students." Clerk's Papers at 115. He mentioned nothing about gymnasium padding or student safety. Although Mr. Martin referenced student safety in his e-mail to Dr. McCulloh, he did not suggest he was concerned about gymnasium safety, as opposed to the swimming pools.

Mr. Martin claims he wanted Mr. Standiford and Dr. McCulloh to review his written pool proposal, which discussed the issue of gymnasium padding. That may be.

But Mr. Martin never provided Mr. Standiford or Dr. McCulloh his proposal. Instead, he submitted e-mails asking for an opportunity to pitch his proposal to the administration. *See* Appellant's Reply Br. at 4. When one of Mr. Standiford's designees, Joel Morgan, demanded to see a copy of Mr. Martin's pool proposal, Mr. Martin refused to provide it. Apparently, Mr. Martin wanted to keep the proposal confidential so that others would not get credit for his ideas.

Like Mr. Standiford, Dr. McCulloh, and Mr. Martin, we have not seen Mr. Martin's pool proposal. A copy is not in the record. It is therefore impossible for us to assess whether the written proposal would have adequately raised gymnasium safety concerns[1] to qualify as a public safety complaint had it been shared. Mr. Martin's assurances that the pool proposal raised safety concerns about lack of gymnasium padding is not sufficient to link Mr. Martin's advocacy efforts with a matter of public policy.

The lead opinion recognizes the paucity of evidence linking Mr. Martin's concerns about gymnasium padding to his termination. Nevertheless, the opinion claims summary judgment is not appropriate on this element of Mr. Martin's claim because, according to Mr. Martin, Mr. Standiford referenced Mr. Martin's leaks about gymnasium injuries to

---

[1] It could well be that the proposal merely mentioned that the revenue from Mr. Martin's pool proposal could be used for deferred maintenance, such as gymnasium padding. This type of reference could hardly be interpreted as a student safety complaint.

2

the press during Mr. Martin's termination meeting. Even taking Mr. Martin's claim as true, this fact does not support Mr. Martin's causation claim.

The issue of whether Mr. Martin was punished for leaking information to the press is different from whether Gonzaga retaliated against Mr. Martin for raising student safety concerns. The governing public policy concerns are different. Mr. Martin has never argued it would be against public policy for Gonzaga to restrict Mr. Martin's ability to speak to the press. In addition, the factual implications of the two types of claims are different. Retaliation for leaking does not imply retaliation for raising the subject matter of the leak. Even if Mr. Standiford was upset with Mr. Martin for talking to the press about student injuries, this does not mean Mr. Standiford also wished to punish Mr. Martin for making internal complaints. The proffered facts about retaliation for press leaks simply do not lend support to Mr. Martin's claims about retaliation for raising student safety concerns.

No facts in the record indicate Mr. Standiford knew Mr. Martin was trying to raise gymnasium safety issues to himself or to Dr. McCulloh prior to Mr. Martin's termination. Given this circumstance, Gonzaga is entitled to summary judgment on the issue of causation.

Pennell, J.

3

No. 34103-8-III

KORSMO, J. (dissenting in part) — I agree with both the lead and concurring opinions that summary judgment was properly granted to Gonzaga University. The university did establish that Mr. Martin was terminated due to insubordination, and he also failed to establish that the gymnasium safety issue was the cause for his termination. However, I disagree with the decision of my colleagues to remand the personnel file issue to superior court. That claim is not yet justiciable.

The legislature did not create a judicial cause of action when it enacted RCW 49.12.240 and .250 governing personnel files.[1] Neither statute indicates that an employee has immediate recourse to the courts. The two provisions are part of the Industrial Welfare chapter of the Revised Code of Washington. Enforcement authority under that chapter is vested with the Director of the Department of Labor and Industries (DLI). RCW 49.12.033; RCW 43.22.270(5).

DLI, in turn, has enacted a series of regulations to enforce the various provisions of chapter 49.12 RCW. *See* Chapter 296-126 WAC. The provision primarily relevant to

---

[1] A companion provision limits application of these statutes. The statutes do not apply in criminal cases and in civil cases where the records are not otherwise discoverable. RCW 49.12.260.

this issue is WAC 296-126-050 that requires employers to keep records on their employees for three years after termination of employment and also requires the employer to make the file available for inspection by the employee at a reasonable time.[2] DLI has enforcement authority. WAC 296-126-226. The first sentence of that provision states: "The department shall investigate the complaint of any individual alleging that these standards have been violated."[3]

For many reasons, this claim does not belong in court. DLI, not the courts, is the first line defender of the rights provided in chapter 49.12 RCW and chapter 296-126 WAC. For Mr. Martin to present this issue to a court, he first would have to ask DLI to investigate and exercise its authority. He does not appear to have done so. He thus has no way of moving from the administrative system to the court system.

Even if he had made the request of DLI and that agency pursued its administrative remedies, it is doubtful Mr. Martin's position could have prevailed. It does not appear that the information Mr. Martin is seeking (employee evaluations) is information that an employer has any obligation to maintain, let alone share with an employee, under this regulation. WAC 296-126-050(1). Gonzaga likewise is under no obligation to have

---

[2] The contents of the file include the employee's name, address and occupation, dates of employment, the wage rate, the number of hours worked, and the amount paid each pay period. WAC 296-126-050(1). Presumably this working definition would govern the issue of what constitutes a "personnel file" under the statute.

[3] The remainder of the provision explains when criminal sanctions apply.

2

No. 34103-8-III
*Martin v. Gonzaga University*

retained this information this long. *Id.* It also appears that the remedy is simply to allow Mr. Martin to look at the files. WAC 296-126-050(2).

Nothing in the statutes or the associated administrative code suggests that Mr. Martin's personnel file claim currently is justiciable. We should not accidentally create a new cause of action by remanding this issue to superior court. The trial judge correctly dismissed the claim at summary judgment.

Accordingly, I dissent from the decision to remand the personnel files issue.

Korsmo, J.

3